# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### Judge Raymond P. Moore

Case No. 13-cv-01722-RM-NRN

BLAKE BROWN, *et al.*,

      Plaintiffs,

v.

UNITED STATES DEPARTMENT OF LABOR, *et al.*,

      Defendants.

---

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

---

Plaintiffs, various individuals who allegedly suffered on-the-job injuries while working for the U.S. government, started this case on July 1, 2013. At the beginning, plaintiffs alleged that defendants violated the Freedom of Information Act ("FOIA") by failing to fully release information related to referee physicians and claimants involved in workers compensation cases. Plaintiffs wanted this information because they strongly suspected (and still do) that defendants were not randomly selecting referee physicians, but instead were using selected physicians over and over again because those physicians produced decisions adverse to claimants—a result that is purportedly good for defendants.

By the time the parties arrived at the beachhead of summary judgment, the matters in dispute had crystallized to a degree. Plaintiffs wanted defendants to release referee physicians' names and zip codes, claimants' partial case numbers and zip codes, and screen shots of the physician directory

system ("PDS") and/or the medical management application ("MMA'). Except in one instance,[1] defendants insisted that they were not required to release any further information, citing Exemption 4 and Exemption 6 to FOIA, and that they were not required under FOIA to create screen shots. This Court agreed with defendant on all fronts.

Plaintiffs then appealed this Court's decision.[2] The Tenth Circuit Court of Appeals agreed with plaintiffs that disputed facts existed over whether Exemption 4 and Exemption 6 applied to referee physicians' names and addresses. The Tenth Circuit, though, affirmed the grant of summary judgment in favor of defendant as to the screen shots plaintiffs had requested.

The case then came back to this Court for resolution of the factual disputes surrounding Exemption 4 and Exemption 6 as applied to referee physicians. From the return of this case, the legal issues as well as the information defendants refuse to release have continued to narrow. Notably, defendants dropped Exemption 6 as a basis for withholding referee physicians' names and addresses. As for the information in dispute, plaintiffs and defendants have rowed back and forth between, respectively, what they want and what they are willing to give. Suffice to say, by the time the bench trial for this case commenced, defendants had released all information originally redacted for what defendants asserted was 75% of the referee physicians. For the remaining 25%, totaling 21 doctors, defendants decided to release various mixtures of information, none of which, though, provided everything that had originally been redacted. In doing so, defendants dropped Exemption 4 as a basis for withholding information for the 75% of referee physicians for whom all information had been released.

---

[1] Defendants asserted that they would release claimants' partial case numbers.

[2] On appeal, plaintiffs did not challenge the redaction of claimants' information.

In other words, when the bench trial began, defendants had chosen to defend their actions solely under Exemption 4, solely with respect to 21 referee physicians, and solely with respect to certain information about those remaining physicians. Then, the parties gave openings. Upon questioning from the Court, plaintiffs' counsel asserted that plaintiffs were only looking for the release of referee physicians' cities, states, and zip codes. Fast forward an hour or so after a morning break in the trial, and defendants' counsel announced that defendants were willing to turn over the zip codes (because cities and states had already been released) for 17 of the remaining 21 referee physicians. The zip codes for the other 4 physicians had already been released.

If only all things could end so happily after five years of litigation. Plaintiffs, though, do not believe that the defendants' slow release of information is an end, let alone a happy one. Plaintiffs still want this Court to declare that Exemption 4 and Exemption 6 did not apply to the information originally redacted. In contrast, defendants believe this case is now moot. The Court will address that issue first.

## I.      Is This Case Moot?

### A.      Findings of Fact

1.      In their Complaint, plaintiffs alleged that they requested documents from defendants that included the names, addresses, and zip codes of all referee physicians used in the ten-year period before their requests.

2.      Plaintiffs further alleged that they needed physicians' names and zip codes in order to make "intelligible" information about how physicians were selected as referees.

3.     Plaintiffs sought declaratory relief that defendants had violated FOIA, and injunctive relief directing defendants to turn over withheld information and enjoining defendants from relying on unlawful practices in future FOIA cases.

4.     In their motion for summary judgment, plaintiffs at various times (but not always at the same time) argued that referee physicians' names, zip codes, and medical specialties were not exempt from release under Exemption 6.

5.     Plaintiffs further argued that there was no way to check whether the selection of physicians was neutral without the physicians' names and zip codes.

6.     In their response to defendants' motion for summary judgment, plaintiffs argued that Exemption 4 did not apply because the names and addresses of referee physicians are available to the public.

7.     In the final pretrial order, plaintiffs agreed that the sole issue following the Tenth Circuit's remand was whether Exemption 4 and Exemption 6 applied to physicians' names and addresses.

8.     Plaintiffs further stipulated to the fact that they exhausted their administrative remedies with respect to the withholding of physicians' names and addresses.

9.     Plaintiffs stated they sought declaratory relief that defendants had violated FOIA, and injunctive relief directing defendants to turn over withheld information and enjoining defendants from relying on unlawful practices in future FOIA cases.

10. In their proposed findings of fact and conclusions of law, plaintiffs stated that this Court should order defendant to produce unredacted reports showing physicians' names and zip codes.

11. At the final pretrial conference, plaintiffs' counsel stated that defendants' offer to provide the physicians' names and zip codes would not resolve plaintiffs' claim because they had not waived their request for addresses and phone numbers.

12. During opening statements at trial, plaintiffs' counsel stated that he would be happy with the release of physicians' cities, states, and zip codes.

13. Following a morning break on the first day of trial, defendants' counsel offered to release physicians' cities, states, and zip codes, and argued that this case was thus moot.

14. Plaintiffs' counsel argued that this case was not moot, asserting that plaintiffs wanted street addresses and a declaration that Exemption 4 and Exemption 6 did not apply to the information plaintiffs requested.

15. Plaintiffs' counsel also speculated about what might happen if a new FOIA request was made for the same information plaintiffs had requested.

16. Julia Tritz ("Tritz"), the deputy director for operations and claims management in the division of federal employees compensation, testified that she was hesitant to give an exact date for when defendants could release unredacted reports.

17.     In closing argument, defendants' counsel stated that unredacted reports could be produced in 60 days, and thought that it could be a matter of weeks.

18.     When the trial concluded, unredacted reports had not been produced.

19.     Instead, defendants have produced spreadsheets containing the names, cities, and states of all referee physicians.

20.     The spreadsheets also contain the zip codes of all but 17 referee physicians for whom defendants had previously redacted such information.[3]

**B.     Conclusions of Law**

"Once the government produces all the documents a plaintiff requests, her claim for relief under the FOIA becomes moot." *Anderson v. U.S. Dep't of Health & Human Services*, 3 F.3d 1383, 1384 (10th Cir. 1993). Here, defendants have not produced the reports plaintiffs have requested. Instead, defendants have *agreed* to produce the requested reports. In any ordinary case, although defendants' agreement may not be enough to immediately moot the action, it would certainly be enough to give defendants a reasonable period of time to actually produce the requested reports without the parties continuing their fight. Then, if the reports were not produced within a reasonable time, the case could simply proceed as if there had been no agreement. The problem is that this is not an ordinary case because defendants did not agree to release the requested reports until the first day of trial; more than five years after the case began. For the Court to allow defendants even more time so that they could follow through on their promises would, thus, seem like giving defendants their cake and allowing them to eat it (slowly, over the course of five years). Moreover, defendants

---

[3] The spreadsheets also fail to reveal the zip codes of at least two other referee physicians. According to defendants, and it is unchallenged by any evidence, the reason the zip codes for these physicians are not revealed is because defendants do not possess that information.

have pointed to no case, and the Court has independently found none, finding that a FOIA case is moot *before* the actual *production* of records requested by a plaintiff. As a result, even if in the proper circumstances a FOIA case could be considered provisionally moot by a defendant's agreement to produce records, the Court does not conclude that this case possesses any appropriate circumstances for allowing defendants time to follow through on their promises.

The Court also rejects defendants' closing argument that this case is moot because defendants did not plan to assert a defense to plaintiffs' FOIA requests. As far as the Court is concerned, the issue is not whether defendants would assert a defense. As *Anderson* makes clear, a FOIA case is moot when the government produces all requested documents. *Anderson* does not say that a FOIA case is moot when the government decides to throw in the towel but not produce documents. Obviously, ordinarily, the two go hand-in-hand—the government drops its arguments and produces documents at the same time. Unfortunately for defendants, this is the odd case in which the two are not hand-in-hand. For that odd happenstance, defendants are solely to blame.

As a result, the Court concludes that this case is not moot because defendants have not produced the reports plaintiffs requested.[4]

Nevertheless, because it is important to address the issue, the Court concludes that, if defendants had actually produced the reports plaintiffs requested, this case would be moot. Whether the case would have been moot, requires the Court to look at three distinct categories of relief plaintiffs sought in their Complaint and the final pretrial order. First, plaintiffs' request for

---

[4] To the extent it could be argued that the spreadsheets defendants introduced into evidence constitute production, as defendants' counsel acknowledged during closing, how the information appears in the spreadsheets is not the same as how the information would appear in the context of the requested reports. In addition, the spreadsheets do not currently possess all of the information that defendants have promised to produce. Therefore, the Court concludes that the spreadsheets do not moot this case.

defendants to turn over the information they requested. As far as the Court is concerned, this category of relief has been amorphous from the initiation of this case. According to the Complaint, the purpose of the information plaintiffs requested was to make "intelligible" defendants' selection of referee physicians. The only information alleged to be needed to make defendants' selection process intelligible was physicians' names and zip codes. This makes perfect sense because, as plaintiffs describe the selection process, it is premised upon the zip code of an injured worker and the proximity (or lack thereof) of a physician in the same zip code. If physicians in the same zip code as the injured worker do not exist or do not agree to act as a referee, the selection process turns to physicians outside of the injured worker's zip code.

In the Complaint, though, plaintiffs alleged that they also sought the "addresses" of physicians. Putting aside that such information is irrelevant for plaintiffs' purported goal of determining whether the selection process is biased, plaintiffs have used the vague term "addresses" in many different guises during the course of this litigation. Until very recently, the request has always been for addresses. As far as the Court is aware, the first time that *street* addresses were requested was following the morning break on the first day of trial. Of course, in order to make this case seem like a controversy, plaintiffs needed to add *street* to its request for addresses because, just an hour or two before, plaintiffs' counsel had said that plaintiffs would be satisfied with the cities and states of physicians. Again, putting aside that cities and states are irrelevant if plaintiffs have physicians' zip codes, the Court does not find creditable plaintiffs' late qualifier that addresses meant street addresses all along. At most, the Court construes plaintiffs' request for addresses to have been a request for cities, states, and zip codes of physicians, in light of the allegations and arguments contained in the Complaint, plaintiffs' summary-judgment papers, the stipulations in the final pretrial

order, and the ultimate purpose of the information requested.  As for plaintiffs' counsel's statement

at the final pretrial conference that plaintiffs had also requested phone numbers, that is worthy of

even less credence.  At no point in this litigation have plaintiffs argued (or even alleged) that FOIA

was violated by defendants' failure to turn over phone numbers of physicians.

Second, plaintiffs' request for a declaration that FOIA was violated by defendants.  Assuming

that defendants had produced the records plaintiffs requested, plaintiffs claim for declaratory relief

would also be moot.  *See Cornucopia Inst. v. U.S. Dep't of Agric.*, 560 F.3d 673, 676 (7th Cir. 2009).

In *Cornucopia*, the Seventh Circuit Court of Appeals rejected a plaintiff's argument that, although

its request for injunctive relief had been mooted by the provision of requested documents, its claim

for declaratory relief remained alive.   The Seventh Circuit stated that declaratory relief is only

appropriate when a ruling would have an impact on the parties, and concluded that there would be

no such impact because documents had been produced and the plaintiff did not seek damages.  *Id*.

Similarly, here, if defendants had produced the requested reports, there would nothing else for

plaintiffs to seek in that regard.  In addition, plaintiffs have not sought damages in this case.  All that

would arguably be left for resolution would be any request for attorneys fees, but, as the Seventh

Circuit explained, that is insufficient because such a request is separate from the merits of this action.

*See id*.

Third, plaintiffs remaining request for relief, arguably, bleeds into whether a declaratory

judgment would have any impact on the parties.   In this case, plaintiffs have also requested an

injunction enjoining defendants from relying on an invalid "regulation or practice" in future FOIA

cases.[5]  Whether plaintiffs were entitled to such injunctive relief was a matter of discussion during

---

[5] Obviously, the Court could not issue such an injunction if it had not already declared a regulation
or practice to be invalid.

the course of the bench trial. Essentially, plaintiffs made the perfectly reasonable argument that, while the production of the information originally requested may be all well and good, such a result has no real meaning if plaintiffs have to re-litigate Exemption 4 and Exemption 6 in any future FOIA request for identical physician information. In turn, defendants also made a perfectly reasonable argument that no future FOIA requests have been made, and thus, plaintiffs do not have standing to seek relief for conduct that has not yet occurred and/or may never occur. Both parties arguments sound reasonable, but they both miss where the answer lies. Plaintiffs are the furthest from the answer. Although plaintiffs' argument, which is more akin to a policy argument, sounds reasonable, plaintiffs provide no legal support for the proposition that this Court can enjoin defendants' supposed future conduct. There is legal support for that proposition, but plaintiffs fail to mention it, and thus, fail to show how they are entitled to it. It is not for this Court to perform that role for plaintiffs.

Nevertheless, because defendants brought up the matter of standing, and certainly implied that a FOIA plaintiff could never seek future injunctive relief, that is not necessarily accurate. The D.C. Circuit and Ninth Circuit, at the very least, have endorsed something known as a "policy or practice" claim. *Payne Enterprises, Inc. v. United States*, 837 F.2d 486, 491 (D.C. Cir. 1988); *Hajro v. U.S. Citizenship & Immigration Services*, 811 F.3d 1086, 1103 (9th Cir. 2015). The Tenth Circuit has not formally adopted such a claim in a published opinion, but, at least one court in this District has allowed a case to proceed on such a basis because the plaintiff alleged a sufficiently concrete likelihood of future harm. *See Smith v. U.S. Immigration & Customs Enforcement*, 249 F. Supp. 3d 1203, 1209-10 (D. Colo. 2017) (WJM). Whether or not a "policy or practice" claim exists in this Circuit, though, as mentioned, plaintiffs cannot possibly be said to have proven such a claim given that they have never even mentioned the concept. The closest plaintiffs have gotten to alluding to

a "policy or practice" claim is in their request for defendants to be enjoined from enforcing an invalid policy or practice. That was merely a request for relief, though, plaintiffs did not present the matter as a cause of action. As a result, the case has proceeded for its entire length on the assumption that the only *claim* put forward by plaintiffs is one for violation of FOIA in the *past* when defendants did not produce all of the requested reports. No other claim has been presented.

Even if the Court was willing to construe plaintiffs' request for future relief as making a "policy or practice" claim, plaintiffs have still not argued (or even alleged) how they have established such a claim. Plaintiffs do not even identify an applicable test. If the Court were to dip into the D.C. and Ninth Circuit cases, one thing that appears required in all is that the *plaintiff* demonstrate that he or she will be subject to the allegedly invalid policy or practice in the near future. Here, the only arguable suggestion that plaintiffs made in this regard was that plaintiffs' *counsel* may make a FOIA request in the future. There is no evidence that the plaintiffs named in this action would make a future FOIA request. Therefore, even if a "policy or practice" claim exists, plaintiffs have failed to prove that they are entitled to relief with respect thereto. As a result, any requested relief in this regard does not make this case any less moot.

In summary, this case is not moot because defendants have not yet produced the reports plaintiffs requested. Nevertheless, had defendants produced the reports plaintiffs requested on a slightly more timely basis than five plus years after initiation of this case, this case would be moot because plaintiffs would not be entitled to declaratory relief or injunctive relief.

## II.    Does Exemption 4 Apply?

Because this case is not moot, the Court will now turn to the merits. Plaintiffs have alleged that defendants violated FOIA in refusing to produce requested documents under Exemption 4 and

Exemption 6.  At some point between entry of the final pretrial order and the filing of defendants' original proposed findings of fact and conclusions of law, defendants chose to stop arguing that the documents plaintiffs requested were protected by Exemption 6.  Although plaintiffs appeared quite happy to proceed with Exemption 6 at the bench trial, the Court stated that it would not hear argument or evidence on an issue defendants had dropped as permitting non-disclosure of the requested documents.  As such, like the trial evidence and argument, the Court will focus on Exemption 4.

Before getting to the meat of the question whether Exemption 4 applies here, it is important to understand what parts of Exemption 4 are at issue and what information plaintiffs contend does not fall within its reach.  Exemption 4 provides that FOIA does not apply to matters that are "trade secrets and commercial or financial information obtained from a person and privileged or confidential."  5 U.S.C. § 552(b)(4).  With respect to Exemption 4, this case has never been about trade secrets or privileged or financial information.  Instead, the application of Exemption 4 in this case has always been about whether the documents plaintiffs requested were "commercial information obtained from a person and confidential."  Before the Tenth Circuit, plaintiffs did not challenge whether the documents at issue had been obtained from a person.  In addition, the Tenth Circuit strongly suggested that the documents at issue involved commercial information.  In the final pretrial order, plaintiffs then did not challenge whether the information was commercial.

As a result, the only issue presented to the Court at the bench trial was whether the documents plaintiffs requested were confidential.  More specifically, in their proposed findings of fact and conclusions of law, as well as at trial, plaintiffs, as is their want, bounced between arguing that physicians' zip codes, names, and addresses are not confidential.  As already discussed,

plaintiffs' flippant use of the term "addresses," at most, means cities, states, and zip codes. Therefore, the issue, properly framed, with respect to Exemption 4 is: whether the names, cities, states, and zip codes of physicians who are used in selecting referees by defendants are confidential for purposes of Exemption 4.

With the issue properly framed, there is one more preliminary matter to resolve: what does "confidential" mean for purposes of Exemption 4. In *Nat'l Parks & Conservation Ass'n v. Morton*, 498 F.2d 765, 770 (D.C. Cir. 1974), the D.C. Circuit explained that information is confidential if it is "(1) likely to impair the Government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained." This is known as the *National Parks* test. In *Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 879 (D.C. Cir. 1992), the D.C. Circuit concluded that the *National Parks* test only applied to situations where information was submitted to the government under compulsion. In situations where information was provided to the government voluntarily, the D.C. Circuit announced a new rule: such information is confidential "if it is of a kind that would customarily not be released to the public by the person from whom it was obtained." *Id*. This is known as the *Critical Mass* test. Not all Circuits have used the *Critical Mass* test. The Tenth Circuit, though, has—in this case. *See Brown v. Perez*, 835 F.3d 1223, 1231 (10th Cir. 2016). The Tenth Circuit says that "determining whether the information submitted to the government agency was given voluntarily or involuntarily" is the first step in analyzing Exemption 4. *Id*. Therefore, the Court will now embark on this first step.

A.     **Voluntary or Involuntary?**

**Findings of Fact**

1.     Defendants purchase a database containing information on physicians from a company called Elsevier, Inc. ("Elsevier").

2.     Defendants utilize information in the database in selecting referee physicians.

3.     Defendants acquire the database from Elsevier pursuant to a licensing agreement.

4.     The licensing agreement is between the U.S. Department of Labor ("DOL") and Elsevier, and is dated September 30, 2006.[6]

5.     The licensing agreement renews automatically every year, unless one party provides notice of termination to the other at least 30 days prior to the expiration of the then-current term.

6.     The licensing agreement can be terminated by either DOL or Elsevier if the other party materially breaches any term of the agreement and the breach continues uncured for 30 days after written notice.

7.     Pursuant to the licensing agreement, Elsevier, as licensor, granted DOL, as licensee, a non-exclusive, non-transferrable license to use the "Database" for certain "Permitted Uses."

8.     In consideration for Elsevier furnishing the Database, DOL is required to pay Elsevier a license fee annually.

---

[6] The evidence did not clearly reflect whether the licensing agreement entered into evidence is the precise agreement that currently exists between DOL and Elsevier. Nonetheless, the evidence did reflect that the terms of the licensing agreement entered into evidence are the same as the current agreement between DOL and Elsevier.

9.   The licensing agreement defines the "Database" as the Official American Board of Medical Specialities ("ABMS") Directory of Board Certified Medical Specialists that has been developed and maintained by Elsevier and ABMS.

10.   DOL is permitted to use the Database on DOL's computers to generate read-only reports on individual physicians for DOL's internal "Credentialing Purposes," which means analyzing a physician's credentials to determine whether the physician possesses particular qualifications or credentials in a medical specialty. The Database may be accessed remotely only if it is done via a secure web site and for DOL's internal purposes.

11.   Elsevier has the right to review DOL's use of the Database.

12.   DOL is required to comply with various guidelines, including, ensuring reasonable protection of ABMS data from unauthorized access.

13.   DOL is required to submit promotional or advertizing materials that include, among other things, mention of the Database to Elsevier for approval.

14.   DOL is required to use a specific copyright notice in promotional pieces and reports issued to third parties that contain the Database.

15.   DOL is required to provide Elsevier with screen shots involving the Database for approval of copyright and co-mingling guidelines.

16.   DOL may not co-mingle the Database with information from any other source.

17.   DOL may not re-license or distribute the Database to any third-party.

18.    DOL acknowledged that Elsevier and ABMS owned all right, title, and interest in the Database.

19.    DOL may not download or copy the Database, except in printing or downloading portions of the Database as a result of discrete searches.

20.    After acceptance of the licensing agreement and receipt of payment, Elsevier is required to provide DOL one copy of the Database on CD-ROM.

21.    Elsevier agreed to provide technical support during the term of the licensing agreement.

22.    Elsevier is required to provide updates to the Database annually.

23.    Elsevier agreed that the format on which the Database is delivered would be free from defects.

24.    Within 30 days of termination of the licensing agreement, DOL is required to destroy or give back to Elsevier all copies of the Database, and expunge any data contained in or derived from the Database that is in DOL's data storage facilities.

25.    Elsevier is under no obligation to license the Database.

**Conclusions of Law**

The burden of establishing that requested documents fall within a FOIA exemption is on the government, here, defendants. *Brown*, 835 F.3d at 1229. Defendants argue that the applicable test for purposes of Exemption 4 is the test for involuntarily submitted information set forth in *National Parks*. This could be considered an odd choice for the government to make, given that the *National Parks* test is generally considered to be the more stringent of the two tests. *See, e.g.*, *Cortez III Serv.*

*Corp., Inc. v. Nat'l Aeronautics & Space Admin.*, 921 F. Supp. 8, 13 (D.D.C. 1996). Perhaps defendants are simply a generous bunch, perhaps they simply want to truly earn any victory they may achieve in this case, whatever drove defendants decisionmaking, it has been clear and consistent throughout this case: defendants want the *National Parks* test applied. Before the Tenth Circuit, the parties did not dispute that the information at issue was submitted involuntarily. *Brown*, 835 F.3d at 1231 & n.4. In the final pretrial order, their proposed findings of fact and conclusions of law, and at trial, plaintiffs have argued that Exemption 4 does not apply irrespective of the test used. At trial, though, plaintiffs clearly argued that the information they requested was voluntarily submitted to defendants by Elsevier. As such, the Court concludes that there is an issue to be resolved in this case as to which test applies, *National Parks* or *Critical Mass*.

The Court concludes that the *Critical Mass* test, i.e., the test for voluntarily submitted information, applies. Notably, defendants have made an abject attempt to establish that the reverse is true—that Elsevier submitted its information involuntarily. Defendants effort is abject in that no evidence, other than the license agreement itself, was presented to show that Elsevier submitted the Database involuntarily. Defendants pointed to no specific provision of the licensing agreement that rendered Elsevier's submission of the Database involuntary. Instead, defendants relied on the general argument that, because Elsevier and DOL entered into a contract, it was required for Elsevier to provide the Database. Considered naturally, defendants argument is that if a third-party enters into *any* type of contract with the government, anything the third-party does pursuant to the contract is required, or, in context, involuntary. To support this interesting proposition, after being invited to provide case law, defendants offered one case involving a contract.

So, is that case helpful?  Not really.  In that case, *Sun-Sentinel Co. v. U.S. Dep't of Homeland Sec.*, 431 F. Supp. 2d 1258 (S.D. Fla. 2006), the court found that *National Parks* was applicable in determining the confidentiality of names and identification numbers of inspectors, which were required to be provided to the Federal Emergency Management Agency ("FEMA") pursuant to contracts between FEMA and various contractors who provided the inspectors.  *Id*. at 1275.  The court stated that it made this finding "[a]fter careful review of the record," which given the citations the court made, presumably included reviewing the contracts between FEMA and the contractors.  *See id*.

The problem is that the *Sun-Sentinel* court did not recite the language of the contracts requiring the contractors to turn over the inspectors' names and identification numbers.  All the court says is that "the *National Parks* test is proper given the wording of the contracts."  *Id*. at 1275 n.15.  Thus, in *Sun-Sentinel*, the language of the relevant contracts very well may have supported a proposition that, in *Sun-Sentinel*, the third-parties were required to turn over certain information.  That is not particularly helpful in this case, given that there can be little dispute that the licensing agreement here almost certainly has different contractual language than the contracts between FEMA and the third-parties in *Sun-Sentinel*.[7]

---

[7] Although the Court is speculating (because the contractual terms are unknown), the third-parties in *Sun-Sentinel* may have been required to turn over to FEMA the names of their inspectors as a *condition of doing business* with FEMA.  This makes perfect sense, seeing as, given the nature of the work FEMA does, FEMA would probably not want to have inspectors doing work in FEMA's name without knowing the names of the inspectors.  *Sun-Sentinel*, thus, could have been much like the many cases that have been decided by district courts in the D.C. Circuit involving FOIA requests for the disclosure of pricing information submitted in connection with bids for government contracts.  In those cases, the D.C. district courts have found the pricing information to have been involuntarily submitted because submitting the pricing information was a condition of making the bid.  In other words, the entity submitting the bid could not do business with the government without disclosing the pricing information.  *See, e.g.*, *Chem. Waste Mgmt., Inc. v. O'Leary*, 1995 WL 115894, at * 3-4 (D.D.C. Feb. 28, 1995); *see also Forest Cnty. Potawatomi Cmty. v. Zinke*, 278 F. Supp. 3d 181, 202 (D.D.C. 2017) (finding that, although an Indian tribe's decision to apply for a license was voluntary, having chosen to apply, the tribe was required to

Turning to the substance of this issue, the problem with defendants' entire approach to it has been that defendants have never discussed the principles underlying *Critical Mass'* test for voluntarily-submitted information. The reason the D.C. Circuit decided to adopt a new test for voluntarily-submitted information was because, as far as the Circuit was concerned, there were different interests at work in protecting such information. More specifically, the D.C. Circuit explained that, when information is voluntarily submitted, the purpose of Exemption 4 "is that of encouraging cooperation with the Government by persons having information useful to officials." *Critical Mass*, 975 F.2d at 878 (quotation omitted). Otherwise, "the ability of the government to make intelligent, well informed decisions will be impaired." *Id.* (quotation omitted).

This is precisely what is at stake here. Defendants made that perfectly clear in their opening statement and closing argument. Notably, *Critical Mass* clearly states that, when information is compelled, the government's interest is in its "continued reliability," while, when information is volunteered, the government's interest is in ensuring its "continued availability." Despite that, in this case, defendants have argued that, if Elsevier's information is released, it will no longer be *available* to the government, and thus, the government's ability to select referee physicians will be impaired. In other words, defendants rely upon the government's interests in volunteered information, not compelled information. Just to make sure that *reliability* was not at issue in this

---

comply with information-submission requirements imposed by the law, making the tribe's submissions involuntary). Here, there is no dispute that Elsevier voluntarily entered into the licensing agreement. Unlike *Forest Cnty.*, though, there is no law imposing any information-submission requirements upon Elsevier in order to continue negotiating the license. Rather, the submission of information is the purpose of the license. Put another way, turning over the Database was not a *condition* for Elsevier to do business with defendants, turning over the Database was the business. *See Judicial Watch v. Dep't of Army*, 466 F. Supp. 2d 112, 125 (D.D.C. 2006) ("The relevant inquiry in this context is whether the specific price elements and other information provided by the submitter were required to be submitted before the agency would award the contract.") (quotation and alterations omitted).

case, defendants' witness from Elsevier testified that the reliability of its information would not be impaired if the same was released. Simply put, defendants have argued for a *National Parks* test based upon a *Critical Mass* exigency that purportedly exists. This Court will not follow that schizophrenic approach.

Here, defendants have repeatedly argued that Elsevier has information useful to the government—because the information is used by the government to select referee physicians—and, without Elsevier's information, defendants' ability to make well-informed decisions would be impaired—because defendants' computer system for selecting referee physicians would need to be overhauled. Defendants have further argued that, if the information at issue in this case was disclosed, Elsevier would attempt to terminate the licensing agreement. In other words, Elsevier would decline to cooperate with defendants if defendants could not ensure the confidentiality of Elsevier's information. Defendants could not have picked out the logic from *Critical Mass* better if they had tried. *See Critical Mass*, 975 F.2d at 878. Put simply, if it sounds like *Critical Mass*, it probably is.

That being said, there is no bright-line rule for when information is submitted voluntarily or involuntarily. At the far end of voluntariness is information simply given to the government with the government giving back nothing in exchange other than the promise of confidentiality, such as the information at issue in *Critical Mass*. At the far end of involuntariness is information given to the government for the sole reason that the government has compelled its disclosure by enforcing a statutory mandate. In the first scenario, the government only needed to promise confidentiality to obtain the information. In the latter, the government had to resort to its statutory powers to extract the information. Obviously, there is a lot of information in the government's control that falls

between these extremes. The licensing agreement at issue in this case does exactly that. Where on the scale of voluntariness/involuntariness the Database sits is perhaps open to debate, but, this Court concludes that it is more voluntary than involuntary.

First, as just discussed, policy considerations significantly favor concluding that the Database was voluntarily provided to defendants. Second, the plain terms of the licensing agreement reflect that defendants are enticing Elsevier's release of the Database on the condition of confidentiality. Confidentiality is embedded throughout the licensing agreement, not least in defendants being prohibited from distributing the Database to any third-party. Of course, there is also the annual fee Elsevier receives as enticement for its cooperation, but, that in no way minimizes the importance of confidentiality. Simply paying Elsevier a fee cannot transform the voluntary release of information into an involuntary act.

The licensing agreement also provides that, after accepting the agreement and receiving payment, Elsevier provide defendants with a copy of the Database. In some sense this can be considered a requirement on Elsevier's part, and it is this provision that the Court believes defendants allude to when they argue that the Database was involuntarily submitted. The provision, though, is more accurately considered a voluntary exchange: defendants voluntarily give money in exchange for Elsevier giving the Database. It is this exchange, as memorialized in a written agreement, that is the sole factor (in favor of involuntariness) that distinguishes the information given by Elsevier and the information given in *Critical Mass*. This Court, though, does not see why the calculus should change merely because, in this case, the government is willing to *pay* for information, while in *Critical Mass* they did not need to. If anything, the government should have an even greater interest in protecting such demonstrably valuable information.

Third, if there are requirements in the licensing agreement, they fall heavily on requiring action (or inaction) by defendants, not Elsevier. Arguably, *pursuant to the contract*, Elsevier is required to (1) provide the Database to defendants (after it receives payment), (2) update the Database annually, and (3) ensure there are no defects in the CD-ROM on which the Database is delivered. Massed against these arguable requirements, are the definite requirements imposed upon defendants. The requirement that defendants only use the Database as permitted in the licensing agreement. The requirement that defendants not distribute the Database to third-parties. The requirement that defendants allow Elsevier to review defendants' use of the Database. The requirement that defendants comply with numerous guidelines for using ABMS data. The requirement that defendants submit promotional and advertizing material to Elsevier for review. The requirement that defendants provide Elsevier with screen shots for approval of copyright and co-mingling guidelines. The requirement that defendants not co-mingle the Database with other material. The Court could go on. Suffice to say, the licensing agreement is a veritable laundry list of requirements on defendants' part. Thus, to turn the licensing agreement on its face, and use one of the purported requirements therein against Elsevier, while ignoring all that is required of defendants. would undermine the purpose of not only the licensing agreement, but also the D.C. Circuit's interpretation of Exemption 4 in *Critical Mass*.

Finally, as Tritz testified, defendants *purchase* information from Elsevier. The licensing agreement provides that Elsevier is *granting* defendants a license to use the Database. The licensing agreement does not provide that the license is being granted because defendants or the law require it, but, instead, because defendants are paying for it. In no reasonable sense can purchasing the Database from Elsevier or Elsevier granting defendants the right to use it be considered Elsevier

involuntarily turning the Database over to defendants. If it was, information provided pursuant to *every* license agreement in which the government enters would have to be considered involuntarily submitted. Not only does such a construction subvert the meaning of a license, it makes no logical sense.[8]

As a result, the Court concludes that the information at issue in this case was voluntarily submitted to defendants, and thus, the *Critical Mass* test for confidentiality applies.

### B.    Customarily Released?

*Critical Mass* provides that, when information is submitted voluntarily to the government, it is confidential "if it is of a kind that would customarily not be released to the public by the person from whom it was obtained." *Critical Mass*, 975 F.2d at 879.

#### Findings of Fact

1.    Joann Amore ("Amore"), the Director of Elsevier's professional certification directory business, testified that part of the data Elsevier sells comes from the ABMS, some is collected directly by Elsevier, and some comes from other sources such as state medical boards or the postal service.

2.    In collecting its own data, Elsevier annually reaches out to physicians, asking them to review and up-date their data.

3.    The data Elsevier sells defendants comes in part from the ABMS and in part from Elsevier's direct contact with doctors.

4.    ABMS' data contains information related to a doctor's board certifications.

---

[8] Defendants have provided no case law holding that a license between the government and a private party involuntarily compels the private party to turn over information for purposes of Exemption 4. Concededly, the Court has found no such case either. Although the burden is on defendants, their inability to provide an on-point case is merely noted; it played no role in the Court determining this issue.

5.      Elsevier pays ABMS for its data.

6.      ABMS can request that information it provides be suppressed from publication by Elsevier.

7.      Suppressed information includes a doctor's gender.

8.      If a zip code is part of an address that is suppressed from publication, Elsevier would consider the address including the zip code confidential.

9.      If a doctor's city and state are published (but not the street address), a zip code could go with the city and state.

10.     Some doctors are totally suppressed, which means that Elsevier cannot even publish the doctor's name. When a customer searches for a doctor who has been totally suppressed, the customer will receive a privacy notice stating that no results for the doctor searched can be displayed.

11.     The data licensed to defendants does not include doctors who have asked for total suppression.

12.     If a doctor asks for only certain information to be suppressed, such as just the doctor's phone number, defendants would receive information on the doctor, but they may or may not receive the information that has been asked to be suppressed, such as the phone number. In some cases, Elsevier will allow suppressed information, such as the phone number, to be in the data provided to defendants provided that there is no risk that the data will be put on a public website.

13. If a doctor is included in licensed data, and the doctor later asks for total privacy, in an update the doctor will vanish.

14. ABMS requires that Elsevier respect suppression requests.

15. A doctor can also reach out to Elsevier privately and ask for data to be suppressed. Elsevier will try to honor those requests as much as they can.

16. Board certifications need to be made available, but other data Elsevier collects does not necessarily need to be made public.

17. It is important for Elsevier to honor suppression requests because Elsevier needs to have a doctor's board certification(s) available to its customers, and, if Elsevier did not honor a suppression request, a doctor could petition his/her board to have total privacy which would prevent customers from confirming certifications.

18. Elsevier also licenses the data it licensed to defendants to hospital or health systems, some health insurance plans, and state boards.

19. Elsevier also licenses the data to a few consumer websites, but they get a smaller subset of data with more restrictions. This data would include doctors' names and specialities, but it may not include addresses.

20. Elsevier licenses the following data about physicians to defendants: board certifications, street addresses, phone numbers, cities, states, and zip codes. Some doctors may have more than one address, and some may have no phone number.

21. Elsevier has a basic template for its licensing agreements.

22.     Elsevier's licensing agreements provide that the licensee is only allowed to use the data for specified purposes.

23.     Elsevier's licensing agreements allow the license to be terminated for a material breach of the agreement.

24.     Elsevier's licensing agreements provide that if the agreement is terminated for any reason, the data must be returned or expunged from the licensee's database within 30 days of termination.

25.     Elsevier's licensing agreements provide that data cannot be redistributed to other people.

26.     If defendants were to release data without permission, Elsevier would terminate the licensing agreement.  Elsevier would do this because it needs to protect the licensed data.

27.     Elsevier performed some additional research into 95 doctors who were involved in one of the reports plaintiffs requested for purposes of determining what data was published about those doctors in 2011 and what data is currently suppressed.

28.     Elsevier did not have a problem with releasing information about 40 doctors because either the doctors or the doctors' contact information did not come from Elsevier's data.

29.     Elsevier did not object to information on 34 doctors being released because, in December 2011, in the last print edition of Elsevier's print product, Elsevier had released the same information.  Where certain contact

information for these 34 doctors has not been released it is because Elsevier did not have that information in its database; it is not due to the information being suppressed.

30.    Elsevier did not object to the release of the names and certain contact information of 21 doctors. The reason why is not perfectly clear. Amore testified that this information could be released because it had not been suppressed, and then later testified that the information could be released because it was in the interests of trying to resolve this case.

31.    The contact information of the 21 doctors that Elsevier agreed to release did not appear in the last print edition of Elsevier's print product.

32.    Elsevier determined that the competitive risk was minimal in releasing information about these 95 doctors.

33.    Elsevier would not grant defendants permission to release any further data.

34.    Elsevier would terminate the licensing agreement if defendants were required to release data from the Database in the future. Elsevier would do this because it cannot allow unspecified and/or unlimited amounts of data to be released.

35.    Elsevier published a print directory with ABMS until December 2011.

36.    Doctors' names and/or contact information were suppressed in Elsevier's print books.

37.    The limitations on information in Elsevier's printed books were similar to the ones Amore discussed with respect to the information licensed to defendants.

38.  Doctors could choose to opt out entirely from the printed books.

39.  The print directories were, for the most part, sold to libraries.  Elsevier could also sell them to individuals and organizations.

40.  The print directories stated that they were proprietary, they could not be loaded into other sources, and they could not be re-published.

41.  ABMS "directory dot com" is an Elsevier publication, and it is accessed via an annual subscription.

42.  ABMS "directory dot com" contains a subset of the data licensed to defendants and has less detail.  Doctors can choose to be opt out entirely from ABMS "directory dot com."

43.  If a doctor requests suppression, his/her data would be suppressed from ABMS "directory dot com."

44.  Another Elsevier publication is "board certified docs dot com," which is produced for the professional credentialing community, and accessed via a subscription.

45.  The data available in "board certified docs dot com" is more similar to the data defendants receive, as it contains all details about professional certifications.  Doctors can request all of their information be suppressed, but, at the very least, a doctor's name and board certification would appear unless the doctor had total privacy.

46.  The subscription agreements for access to "board certified docs dot com" indicate that doctor profiles can be used for purposes of credentialing, and the profiles cannot be re-sold, loaded into other databases, or copied.

47. Elsevier sells electronic subscriptions to libraries for access to its data. Libraries do not get the same data licensed to defendants.

48. The libraries' subscriptions give access to ABMS "directory dot com," which gives users of the subscription access to the subset of data contained on that site. Users can search by name or specialty.

49. A subscribing library is given a password that allows access for one year. On some occasions, the library will not need to use the password because the library's computer signature will be recognized by Elsevier's database.

50. Elsevier also sells subscriptions to libraries allowing five patrons of the library to access ABMS "directory dot com" at the same time. A patron can see a doctor's address or city if that information is allowed to be published.

51. In subscription agreements that are signed by parties subscribing to ABMS "directory dot com" there are restrictions on the use of Elsevier's data, and the subscription agreements provide that the data cannot be re-sold or loaded onto other databases and the data can only be used on the subscribing party's premises. These same restrictions and provisions are on ABMS "directory dot com" itself.

52. Elsevier sells mail-in lists of various medical specialities.

53. The mail-in lists are for one-time use, and Elsevier must approve the item being mailed.

54. Elsevier provides a user-guide for law firms to help them search for expert witnesses.

55.     In 2011, ABMS required doctors to make their names, board certifications, cities, and states available for confirmation.

**Conclusions of Law**

It is defendants' burden to prove Elsevier's custom(s).  *Critical Mass*, 975 F.2d at 879.  In that regard, it is the custom of release to the *public* that is at issue.  *Id*.  In addition, it is *Elsevier's* custom that is relevant,[9] not "how the industry as a whole treats the information."  *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 244 F.3d 144, 148 (D.C. Cir. 2001).  Further, "[a] party can voluntarily make protected disclosures of information, and as long as the disclosures are not made to the general public, such disclosures do not constitute customary disclosures."  *Id*.

Before beginning, it is very important to mention again the very odd posture of this case.  Like a legal sausage maker, defendants have attempted to slice the information at issue in this case into a few tiny slices.  The embodiment of this handiwork are the three spreadsheets attached to Exhibit T.  Although spreadsheet 1 will be mentioned later, for now it is irrelevant because Amore testified that none of the information therein came from Elsevier.  As such, it helps little in determining Elsevier's custom.  Spreadsheets 2 and 3, however, do contain Elsevier information.  According to Amore, spreadsheet 2 contains all of the contact information in Elsevier's database for 34 doctors that was *released* in the final print edition of Elsevier's printed directory.  Amore also testified that the printed directories were sold mostly to libraries.  To the extent there is a custom

---

[9] As a result, the Court rejects plaintiffs' argument at closing that ABMS is the relevant party for purposes of determining custom.  *Critical Mass* is clear that the custom must be that of the party from whom the information was obtained.  Here, it is undeniable, however much plaintiffs may want to deny it, that the information at issue in this case came from a database licensed by Elsevier to defendants.  The fact that some of the information in Elsevier's database came from ABMS is irrelevant.

there, it is that at least some of Elsevier's information *can* be released to the public through a printed product sold to libraries.

Spreadsheet 3 is where things become less clear. According to defendants' letter in Exhibit T, the names and contact information included in spreadsheet 3 are of 21 doctors who have not asked for that information to be suppressed. In addition, Amore clarified that the information contained in spreadsheet 3 was not released in Elsevier's printed product. Thus, it would appear that Elsevier will allow its information to be released if a doctor does not ask for suppression of that information, even if the same has not been included in a printed (or, presumably, an online) directory. Whether that is a custom of Elsevier is far from clear though. Ultimately, however, the burden is on defendants, and, in this case, the Court has not been presented with an argument that Elsevier would customarily not release the information included in spreadsheet 3.

There is still more to spreadsheet 3 though. Specifically, the information *not* contained in the spreadsheet. According to defendants' letter in Exhibit T, contact information for a doctor that is not included in spreadsheet 3 *is* subject to a requested suppression, and thus, that information does not appear in the spreadsheet. Until the first day of the bench trial, therefore, it could be said that Elsevier had a custom of *not* releasing information if the information was subject to a requested suppression. So it is clear, the information that has not been released in spreadsheet 3 was phone numbers, street addresses, and zip codes. As the Court has already discussed, plaintiffs have limited their request to zip codes. Therefore, when the bench trial began, arguably only one slice of the sausage remained: the zip codes of 17 doctors. On the first day of the bench trial, though, defendants stated that even this final slice had disappeared because they would provide the previously unreleased zip codes to plaintiffs. What that means for Elsevier's custom of not releasing

information that is subject to a requested suppression will be discussed more shortly. In terms of how this Court goes about tackling the *Critical Mass* test, it leaves at least one question.

Notably, with respect to what information is the Court meant to determine whether defendants have proven a custom? Defendants have made no effort to clearly explain as to which informational vantage point Elsevier's customs should be considered directed. Is it the information included in spreadsheet 2? Based upon the Court's understanding of defendants' arguments, the answer is probably not. Is it the information included in spreadsheet 3? As mentioned, defendants have made no argument that Elsevier does not customarily release the information included in spreadsheet 3. Thus, presumably, their answer is again no. That leaves the information not included in spreadsheet 3, which for purposes of this case is the zip codes of 17 doctors. In closing argument, the only arguable custom to which defendants pointed was related to this type of information. Specifically, defendants argued that suppressed information is not customarily provided by Elsevier. In this light, defendants presumably want this Court to look only at the final slice of the sausage, and consider whether that slice is customarily released to the public.

There is another option: that the sausage should not be sliced at all. *Critical Mass* explains that "information provided to the Government" voluntarily is confidential if it would not be customarily released to the public. *Critical Mass*, 975 F.2d at 897. Read naturally, "information provided to the Government" would seem to imply the information given to the government. As Amore testified, here, that would mean doctors' names, board certifications, street addresses, phone numbers, cities, states, and zip codes. All of that information would be "information provided to the Government" by Elsevier. Defendants, however, argue that there is no controversy with respect to much of this information because they have released much of it in some form and/or have agreed to

release it in the format plaintiffs requested. Taking that argument to the extreme reached on the first day of the bench trial, there would be no controversy here because defendants have agreed to release all of the information still at issue. Until defendants produce all of the requested documents, however, that is not so.

In this light, there is an open question as to whether the Court should consider the information provided to defendants as being merely the suppressed information or all of the information Elsevier provided to the government.[10] Because the Court believes it important to address both possible options, the Court will analyze the *Critical Mass* test from both perspectives.[11]

The Court begins with suppressed information. As an initial matter, the Court observes the misnomer in describing information as *suppressed* in the context of information that has purportedly been *provided* to the government. The very nature of suppression is that it has *not* been provided. *See* New Oxford American Dictionary 1748 (3d ed. 2010) (defining "suppress" as, *inter alia*, "prevent[ing] the dissemination of (information)"). Simply put, if Elsevier suppressed any information, then defendants really should not have that information at all even if they wanted to release it to plaintiffs. Of course, the suppressed information involved in the case might have conveniently been suppressed as to everyone *other than* defendants. Putting aside that, that would

---

[10] So it is clear, if this case had begun five plus years ago with defendants having released all information other than suppressed information, the Court can imagine a different debate as to what information was relevant for purposes of determining whether the same had been customarily released. That, however, is not what happened here.

[11] The Court does so to a great extent without the benefit of helpful argument from the parties, as neither side has come close to adequately addressing this issue. Both sides have mentioned a similar idea in the context of whether this case is moot, but, neither has even suggested what "information provided to the Government" means for purposes of the *Critical Mass* test. If the Court were to hazard a guess based upon the parties' overall arguments in this case, defendants' position would likely be that the only information at issue is suppressed information, while plaintiffs' position would likely be that all information provided to defendants is relevant. Whether that is a close prediction, though, is irrelevant.

undermine the purpose of Elsevier respecting a doctor's request for suppression, it also does not really comport with Amore's testimony. Notably, Amore was equivocal in explaining what would happen if a doctor requested some but not all of his/her contact information be suppressed. Amore testified that the pertinent contact information may or may not end up in the information defendants received, and, in some cases, the contact information may be provided to defendants if it was determined that there would be no risk of the information being made public. That would seem to undermine Amore's testimony that ABMS *requires* Elsevier to respect suppression requests and that it is important for Elsevier to honor suppression requests.[12] In any event, it does not support a suggestion that all suppressed information has been suppressed as to everyone other than defendants.

Despite the seeming contradiction of defendants being in possession of information that is meant to be suppressed, somehow defendants are in possession of some such information. For example, given that defendants have agreed to release the zip codes of 17 doctors that were not provided on spreadsheet 3, defendants presumably are or were in control of those zip codes.[13] Otherwise, why else would the parties be here? *See U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 144-145, 109 S.Ct. 2841 (1989) (explaining that "agency records" for purposes of FOIA are those materials either created or obtained by an agency and in the agency's control at the time they

---

[12] The only way this testimony would not be undermined is if the doctor requesting suppression also stated that the request did not apply to the government. Apart from being a seemingly odd request, there is no evidence that this is why defendants may or may not receive suppressed information.

[13] One could reasonably wonder, and the Court has, how defendants are in possession of these 17 zip codes. Because the zip codes were not included on spreadsheet 3, defendants' letter in Exhibit T explained that the zip codes were suppressed information. It seems very convenient, perhaps too convenient, for defendants to be in possession of all 17 zip codes when, at best, Amore's testimony indicates that the decision to give defendants suppressed information is made on a case-by-case basis.

are requested). Assuming, therefore, that there is some suppressed information that defendants control (or did at the time of plaintiffs' requests), what is Elsevier's custom with respect to it?

Amore's testimony reflects that, at least as of the first day of the bench trial, Elsevier had a stated custom of not releasing suppressed information. As just discussed, with respect to how that custom is or was enforced against defendants, there are obviously some holes in it. If the "customarily released" test looked at how information is customarily released to the government, the foregoing could be a problem for defendants, at least as it pertains to the information at issue in this case. That, however, is not the relevant perspective for the test. The test instead looks to the custom of public release. *See Critical Mass*, 975 F.2d at 879.

Here, the evidence reflects that Elsevier certainly provides information to parties other than defendants. For example, Elsevier publishes ABMS "directory dot com," Elsevier publishes a directory on "board certified docs dot com," Elsevier sells electronic subscriptions to libraries, and Elsevier produced a printed directory with ABMS until December 2011. With respect to all of these publications or subscriptions, Amore testified that information was suppressed.[14] Plaintiffs have not introduced any evidence contradicting Amore's testimony in this regard.[15] There are also other ways

---

[14] The only arguable exception concerns "board certified docs dot com," which will show a doctor's name and board certification even if the doctor has requested all of his/her information be suppressed, unless the doctor has total privacy. Plaintiffs, though, do not argue that the release of names and board certifications, despite a request for suppression, should be considered information that is customarily released. Even if plaintiffs had, the Court would not conclude that the suppressed information at issue in this case is "of a kind" with the names and board certifications released by "board certified docs dot com." *See Critical Mass*, 975 F.2d at 879.

[15] So it is clear, plaintiffs have argued that information Elsevier provides defendants is in the public domain. Whether that is so will be discussed later, but, because plaintiffs may have confused the two concepts, whether or not information is in the public domain is irrelevant to whether Elsevier customarily releases that information. *See Ctr. for Auto Safety*, 244 F.3d at 151-152. Here, despite plaintiffs' frequent hand motions toward dense books and arguments that public libraries have access to Elsevier's information, plaintiffs have provided no evidence contradicting Amore's testimony that suppressed information is not released to, for example, public libraries.

Elsevier releases its information. Amore testified that Elsevier licenses the data it provided to defendants to hospital or health systems, some health insurance plans, and state boards. Amore also testified that Elsevier sells mail-in lists. There was no testimony, however, as to whether suppressed information is excluded from the information contained in these licenses and mail-in lists. Equally, though, there is no evidence that suppressed information is contained in these releases. Finally, Amore testified that Elsevier licenses data to a "few" consumer websites. Amore testified that the consumer websites get a smaller subset of data with more restrictions, and the data may not include addresses. Again, though, there has been no development of whether the consumer websites receive suppressed information.

Ultimately, even if the Court were to assume that information released pursuant to licenses and subscriptions constituted releases to the public for purposes of the *Critical Mass* test,[16] the Court concludes that defendants have met their burden of establishing Elsevier's custom of not releasing suppressed information to the public. Notably, there is no evidence in the record contradicting Amore's testimony as to this public custom.[17] Thus, to the extent that the information relevant to the *Critical Mass* test is suppressed information, the Court concludes that defendants have shown that Exemption 4 applies.

---

[16] *Cf. Ctr. for Auto Safety*, 244 F.3d at 148 (explaining that, as long as disclosures are not made to the "general public," a party can make protected disclosures of information without them being "customary" for purposes of *Critical Mass*). The Court will discuss this matter—i.e., whether Elsevier customarily releases any information to the public—in more detail below.

[17] The mail-in lists may have been helpful in contradicting Amore's testimony in this regard. It is certainly more than plausible that if Elsevier is selling mail-in lists, those lists may contain contact information that is otherwise suppressed in other publications. Despite plaintiffs bringing the topic of mail-in lists up during Amore's cross-examination, little hay was made on the matter. Notably, there has been no evidence, such as one of the mail-in lists Elsevier sold, introduced or any argument that one or more of those mail-in lists contained suppressed information.

The Court now addresses whether or not defendants have made the same showing with respect to all of the information Elsevier provides defendants. As mentioned, Amore testified that defendants receive doctors' names, board certifications, street addresses, phone numbers, cities, states, and zip codes. What is Elsevier's custom with respect to this information? Well, that is an interesting question because defendants do not attempt to even claim that there is a custom. As discussed, the only custom defendants arguably rely upon is the non-release of suppressed information. Putting that aside for now, there is a more pressing question.

The *Critical Mass* test asks whether information provided to the government is of a kind that would customarily not be released to the *public*. *Critical Mass*, 975 F.2d at 879. In *Ctr. for Auto Safety*, the D.C. Circuit explained that "[a] party can voluntarily make protected disclosures of information, and as long as the disclosures are not made to the general public, such disclosures do not constitute customary disclosures." *Ctr. for Auto Safety*, 244 F.3d at 148. This statement strongly suggests (to the extent it does not actually say it) that the *Critical Mass* test is concerned with releases to the general public. In this case, for the releases of which there is evidence in the record, few involve releases of information to the general public. Instead, the vast majority are best categorized as protected disclosures of information.

In this latter category are licenses to hospital or health systems, health insurance plans, state boards, and consumer websites. Amore's testimony is clear that Elsevier's licensing agreements allow the licensee to use data for specific purposes, provide that Elsevier's data cannot be redistributed, and require that Elsevier's data be returned or expunged following any termination of the agreement. The Court concludes that the release of Elsevier's data pursuant to such licensing

agreements is a "protected disclosure[] of information," and thus, not a customary release for purposes of *Critical Mass*. *See Ctr. for Auto Safety*, 244 F.3d at 148.

Then there are the subscriptions Elsevier sold/sells to ABMS "directory dot com" and to "board certified docs dot com," as well as the printed books Elsevier published with ABMS up to December 2011.[18] Other than the subscriptions and books that were sold to public libraries, these subscriptions and books are also in the category of protected disclosures of information. With respect to "board certified docs dot com," Amore testified that this publication was for the professional credentialing community. There is no evidence in the record contradicting this testimony.[19] Amore also testified that subscription agreements to "board certified docs dot com" contained restrictions on the use of data, as well as prohibitions on re-selling or copying data contained therein. As a result, because "board certified docs dot com" was for the professional credentialing community (and not the general public) and Elsevier protected the information released, the Court concludes that the release of information on "board certified docs dot com" is not a customary release for purposes of *Critical Mass*.

---

[18] Although Elsevier and ABMS stopped publishing printed books in December 2011, no evidence was presented or argument made that those printed books are not still in the public domain. *See Cottone v. Reno*, 193 F.3d 550, 556 (D.C. Cir. 1999) (explaining that, once a FOIA requester has carried its burden of showing that information is in the public domain, it is up to the government (if it so chooses) "to rebut the plaintiff's proof by demonstrating that the specific tapes or records identified have since been destroyed, placed under seal, or otherwise removed from the public domain."). Here, defendants have made no such attempt. Moreover, it would appear that, apart from being in public libraries and being dragged into court for the two days of trial by plaintiffs' counsel, the printed books were still available from sources such as ebay.com as of November 21, 2017. *See* Plaintiffs' Exhibit 59.

[19] Plaintiffs attempted to make much of their assertion that Elsevier's information could be sold to individuals. Whether this argument related to ABMS "directory dot com," "board certified docs dot com," Elsevier's printed books, or all of them, is unclear. In any event, the furthest plaintiffs got in this line of argument was in getting Amore to testify that individuals *could* buy a license to use Elsevier's information. There is no evidence in the record that an individual actually did purchase such a license, and, as Amore testified, its licenses were intended for institutional, rather than individual, use.

As for subscriptions to ABMS "directory dot com" and books Elsevier published with ABMS, excluding the subscriptions and books sold to public libraries (which will be discussed later), it is not exactly clear from the evidence whom these subscriptions and books are/were sold to other than public and medical school libraries. To the extent there are other sources that purchase these subscriptions, plaintiffs have failed to identify them and the evidence does not reflect that there is a source even closely approximating that of a public library in terms of releases to the general public.[20] Even releases to medical school libraries do not suggest a release of information to the general public, as the students, lecturers, and doctors, etc. that make up the likely people allowed entry to the medical school library represent only a subset of the general public. In addition, Elsevier places/placed restrictions on the use of the data contained in ABMS "directory dot com" and on the use of its printed books. As such, except as to public libraries, the release of information through ABMS "directory dot com" or Elsevier's printed books does not constitute a customary release for purposes of *Critical Mass*.

This leaves subscriptions to ABMS "directory dot com" and printed books that are/were sold to public libraries.[21] As just mentioned, Elsevier places restrictions on the use of data provided on

---

[20] As discussed, even if the sale of a subscription to an *individual* member of the public could constitute a release to the general public, there is no evidence that subscriptions were sold to individual members of the public.

[21] There is also Elsevier's mail-in lists. As already discussed, plaintiffs have made no attempt to develop this potential line of inquiry into a coherent reason for why Elsevier should be considered as customarily releasing to the public the information it licenses to defendants. Even if plaintiffs had done more, and even if the mail-in lists could be considered a customary release to the public, the Court would still not find that the mail-in lists were relevant to the analysis herein because there has been no evidence presented that the information contained in the mail-in lists is of "of a kind" with the information licensed to defendants.

In addition, there was reference during the bench trial of an "ABMS website" and the website of Colorado's Department of Regulatory Agencies ("DORA"). The Court took judicial notice of both of these websites. So, the record is clear, the "ABMS website" is **not** the same thing as ABMS "directory dot com." Amore testified that, unlike ABMS "directory dot com," Elsevier does not control the ABMS website. As

ABMS "directory dot com," prohibits re-selling or copying the data, and allows the data to be accessed only on a library's premises. The same was true of its printed books. The release of information through ABMS "directory dot com" and the printed books, therefore, is clearly protected in terms of how and where it can/could be used. That, however, is not the end of the inquiry because *Ctr. for Auto Safety* states that the voluntary disclosure of protected information will not be considered a customary release for purposes of *Critical Mass* "as long as the disclosures are not made to the general public." *Ctr. for Auto Safety*, 244 F.3d at 148.

In that regard, the evidence reflects that patrons of a public library can access the subscription sold to a library. The Court also does not believe it is disputed that patrons of a library could obtain access to printed books of the library, such as Elsevier's printed books. As for evidence of restrictions on patrons that can access a library's subscription, there is no evidence. Amore simply testified that a subscribing library is given a password, and, on some occasions, the library will not need to use the password because the library's computer signature will be recognized by Elsevier's database. In other words, the evidence reflects that any patron of the library can access ABMS "directory dot com." The only restriction on the public's access to the information Elsevier has released, therefore, is the restrictions (if any) a public library places on members of the public becoming a patron. No evidence with respect to restrictions on members of the public becoming a patron of a library is in the record, and there probably needs to be no such evidence, as, whatever restrictions there may be would seem insufficient to consider information available in a public library as not having been released to the general public.

---

such, any information that may be released on the ABMS website (which is also referred to in the record as "certification matters") is irrelevant for the *Critical Mass* test because it has not been released by Elsevier. *See Ctr. for Auto Safety*, 244 F.3d at 148. The same is true for the information released on DORA's website.

At closing argument, when presented with this matter—i.e., why information available in a public library should still be considered confidential—defendants' counsel focused upon another part of the *Critical Mass* test (which the Court will get to soon). The fact of the matter is, though, that defendants did not argue that information available in a public library should not be considered a release to the general public. Nor should they have; it is obviously not a strong argument. Simply put, if information available in a public library is not considered a release of information to the general public, the Court cannot imagine what would be.[22] As a result, the Court finds that Elsevier has released to the general public the information provided on ABMS "directory dot com" and in its printed books that ended in December 2011. The Court further concludes that it is Elsevier's custom to release to the general public the information on ABMS "directory dot com" and in its printed books, in light of Amore's testimony that Elsevier sold its printed books to libraries and sells subscriptions to public libraries that give access to ABMS "directory dot com"—as far as the Court is concerned, those are customs.

Where does that leave matters? Well, there is still one more question that must be resolved under *Critical Mass*. That question is whether the information provided to the government is "of

---

[22] In *Ctr. for Auto Safety*, the D.C. Circuit also rejected an argument that "the mere selling" of a product on the open market could constitute evidence of customary release. *Ctr. for Auto Safety*, 244 F.3d at 151. This Court does not find that statement applicable here. Although the statement sounds helpful to defendants in a vacuum, further context is provided in *Ctr. for Auto Safety*. Notably, the products that had been sold on the open market were airbags. *Id*. The FOIA requester argued that the information it had requested related to the airbags, in that the airbags could be examined, and the information it wanted could be obtained from this examination. *See id*. The D.C. Circuit rejected this argument, explaining that the information at issue involved data on each vehicle manufactured or imported into the United States between 1990 and 1998. *Id*. The D.C. Circuit stated that the fact that airbags could be inspected did not establish that data on every car produced over many years was customarily released. *Id*. Here, the "product" being sold is very different. Notably, unlike the airbags, which were merely related (however weakly) to information being requested, here, the information being requested is the information being sold. Thus, unlike the airbags, here, the information being sold could establish whether the information requested was customarily released.

a kind" with the information available on ABMS "directory dot com" and/or Elsevier's printed books. *See Critical Mass*, 975 F.2d at 879. To repeat, Amore testified that defendants receive the following information: doctors' board certifications, street addresses, phone numbers, cities, states, and zip codes. As for ABMS "directory dot com," Amore testified that the information available on the site was "a subset with less detail." According to Amore, the purpose of ABMS "directory dot com" is primarily to allow the public or patients to determine if their doctor is board certified or to determine the board certified doctors in a specific city. Amore testified that ABMS "directory dot com" does not contain the dates a doctor was certified, when a certification expires, how often a doctor has re-certified, or if a certification is not active. Amore further testified that a doctor could completely opt out of ABMS "directory dot com." If a doctor has not opted out from ABMS "directory dot com" or asked for his/her information to be suppressed, a person in a library using ABMS "directory dot com" will see the doctor's name, address, and city.

In this light, one clear difference between the information licensed to defendants and the information available on ABMS "directory dot com" is the level of detail with respect to a doctor's board certification(s). The evidence is less clear as to another potential difference: the contact information available on ABMS "directory dot com." On direct examination, the closest Amore got to providing some color on this matter was in explaining that one of the purposes of ABMS "directory dot com" is to determine the board certified doctors in, for example, Grand Rapids. Thus, it would appear that, at the very least, a doctor's city is released on ABMS "directory dot com." On cross-examination, in response to a question from plaintiffs' counsel whether a library patron using ABMS "directory dot com" could see a doctor's "name, address, city, town," Amore testified that,

provided that a doctor had not asked for his/her information to be suppressed or removed, the doctor's address and city could be seen.

Nonetheless, to the extent there is an evidentiary gap as to what contact information (such as a doctor's state, zip code, or phone number) is available on ABMS "directory dot com," the hole is filled-in by Elsevier's printed books. Amore testified that the limitations on information in the printed books was similar to limitations discussed with respect to information licensed to defendants. Amore further testified that information would be suppressed in the printed books. More illuminating, though, is Amore's testimony that all of the information contained in spreadsheet 2 had been published in the final edition of Elsevier's printed books. That information includes names, street addresses, cities, states, zip codes, and phone numbers of numerous doctors. Not every one of the 34 doctors listed has every piece of contact information, but, that is only because Elsevier did not have the information that is missing. If Elsevier did not have this information, then it could not have been provided to defendants. Put another way, with respect to the 34 doctors on spreadsheet 2, defendants and the printed books had the same information. Thus, at least as it pertains to doctors who were included in the printed books, a patron of a library could learn the same contact information for those doctors as defendants.

At this juncture, it is necessary to delve a little deeper into what "of a kind" means for purposes of *Critical Mass*. In *Ctr. for Auto Safety*, the D.C. Circuit provided some explanation. The D.C. Circuit stated that information for this purpose need not be identical. *Ctr. for Auto Safety*, 244 F.3d at 153. The D.C. Circuit further explained that "substantial differences in level of detail can produce a difference in type of information." *Id*. at 152. The D.C. Circuit applied this logic with respect to two specific pieces of evidence the FOIA requester relied upon. First was information for

a generic 1993-94 Toyota vehicle. The D.C. Circuit stated that this evidence was different in type to the information requested because the requested information involved data for every 1990-98 Toyota vehicle. The D.C. Circuit, thus, concluded that vehicle information pertaining to a single model and a single year was not customary disclosure of multi-model, multi-year information. Second was evidence of a GM chart listing vehicle models for 1993-96, as well as driver and passenger airbag material and weave for those vehicles. *Id*. Although the D.C. Circuit did not definitively rule on this evidence, it observed that defendants' counsel was unable to explain why the multi-year, multi-model information was not evidence of customary release. *Id*. at 152-153. In addition, the D.C. Circuit appeared to give little credence to defendants' subsequent attempts to argue that the evidence differed in material respects. *Id*.

In this light, the pertinent question is whether the information available on ABMS "directory dot com" and in Elsevier's printed books (i.e., to the extent the information was not suppressed, doctors' names, street addresses, cities, states, zip codes, phone numbers, and the fact that they are board certified) is evidence of the customary release of the information licensed to defendants (i.e., doctors' names and board certifications, and, to the extent the information was not suppressed, street addresses, phone numbers, cities, states, and zip codes). *See Ctr. for Auto Safety*, 244 F.3d at 151-152.

The Court concludes that the information available to the general public, in particular in Elsevier's printed books, is evidence of the customary release of the information licensed to defendants because the latter is "of a kind" with the former. For sure, the information available in Elsevier's printed books is not in every sense identical to the information licensed to defendants. This is likely true with respect to the level of detail provided to defendants with respect to a doctor's

board certification(s).[23]  The information, though, does not need to be identical.  *See id*. at 153.  That being said, in many respects the information is identical, particularly with respect to contact information.  Spreadsheet 2 is definitive evidence of that.

There is, of course, spreadsheet 3.  According to Amore, the 21 doctors listed in spreadsheet 3 were not published in the 2011 or 2012 editions of Elsevier's printed books.  That, obviously, does not establish that the 21 doctors were not published in an earlier edition of the printed book.  But, putting that aside, and assuming that the 21 doctors were never published in one of Elsevier's printed books, the Court still does not conclude that this changes the calculus.  Notably, the D.C. Circuit explained that "substantial differences in level of detail can produce a difference in type of information."  *See id*. at 152.  No argument in this respect is made by defendants, but, it is not beyond the realm of logical thought that no details on a doctor could constitute a substantial difference producing a difference in the type of information.  In light of the D.C. Circuit's discussion of the evidence in *Ctr. for Auto Safety*, this Court does not believe that is true here.  As just discussed, the D.C. Circuit concluded that vehicle information on a single model in a single year was not evidence of customary disclosure of multi-model, multi-year information, while other multi-model, multi-year information might be.  *Id*.  Importantly, the publicly disclosed multi-model, multi-year information was for the period 1993-96, while the information provided to the government related to the period 1990-98.  *Id*. at 145, 152.

---

[23] The Court notes that, other than Amore's general testimony that defendants receive more detailed information with respect to a doctor's board certification(s), no evidence has been presented that, with respect to the doctors at issue in this case, defendants did actually receive more detailed information in this regard than is available in Elsevier's printed books.  Nonetheless, the Court accepts Amore's general testimony as establishing that defendants received more detailed information with respect to board certifications.

Here, the Court concludes that the information provided in Elsevier's printed books is more like the multi-model, multi-year information that the D.C. Circuit suggested was evidence of customary disclosure, rather than the single-model, single-year information. Notably, with respect to at least 40 doctors, except for the detail of board certifications, the type of information provided to defendants and in the printed books was identical. Moreover, to the extent it is relevant, the type of information was identical with respect to the matters that have always been at issue in this case. The fact that the printed books contained no information with respect to 21 doctors does not create a difference in the *type* of information that was provided in the printed books. In that regard, this Court does not see any difference between the lack of information on 21 doctors here and the lack of information on model years for the periods between 1990-92 and 1997-98 in *Ctr. for Auto Safety*. Put another way, merely because Elsevier's printed books may have contained information on less doctors, does not mean that the type of information provided as to those doctors was different to the type of information provided to defendants.[24]

Ultimately, *Critical Mass* asks whether the information provided to the government is "of a kind" with information that would customarily not be released. Here, this Court concludes that the answer to that question is "no" because the information Elsevier licensed to the government is "of a kind" with information that Elsevier has released to the general public. As a result, to the extent that the information relevant to the *Critical Mass* test is all of the information Elsevier licensed to defendants, the Court concludes that defendants have failed to show that Exemption 4 applies.

---

[24] The Court acknowledges that Amore testified that, if a doctor opted out of ABMS "directory dot com," none of his/her information would appear. Although there is no evidence of this, perhaps the 21 doctors on spreadsheet 3 are examples of doctors who opted out. Whatever may be true, as discussed, even if an unknown number of doctors opted out, at least in this case, that does not change the *type* of information Elsevier released to the public.

There is still more on this specific issue. During closing argument, defendants appeared to argue that, rather than looking at the individual pieces of information that Elsevier provides, the Court should consider whether Elsevier customarily releases the "package" that it provides defendants. By "package," defendants appear to mean "the database" provided to them pursuant to their licensing agreement with Elsevier. According to defendants, the database is uniform, nationwide, and contains half a million names. Most importantly for defendants, the database allows them to run their program for selecting referee physicians. Defendants assert that a search that can be done on ABMS "directory dot com" is simply not the same as a search done on their computers using the database.

That may be all well and true, but, the fundamental problem is that plaintiffs are not asking defendants to release the database; plaintiffs merely want some of the information as to some of the doctors in the database. Effectively, therefore, defendants are attempting to assert an exemption as to something that has not been asked for. Just as defendants have rationally argued that there may be no controversy as to information that it has agreed to release, it is equally (if not more) rational that there is no controversy as to a product—the database—that plaintiffs have not asked to be released under FOIA. A further problem is that the *Critical Mass* test asks whether *information* is customarily released. As far as the Court is concerned, the database itself is not information for this purpose. Although the database contains information, the database itself is a product or, as defendants put it, a package. Essentially, therefore, defendants ask for the goal posts to be shifted away from the actual information that has been requested in this case. This the Court will not do, and thus, rejects defendants' argument in this regard.[25]

---

[25] The Court also notes that it is more than a little disingenuous for defendants to argue, at one moment, that the only information at issue is suppressed information, while, at another moment, argue that

Having concluded that Exemption 4 applies if "information presented to the Government" means merely suppressed information, but Exemption 4 does not apply if it means all of the information Elsevier provided to defendants, the Court must resolve from which perspective "information presented to the Government" should be viewed. Based upon the unique circumstances of this case and a natural reading of the phrase, the Court concludes that, in this case, "information presented to the Government" means all of the information Elsevier provided to defendants. First, the circumstances of this case. The Court believes they are (hopefully) unique. This is not because defendants have released some information, and withheld other information. That is likely a frequent occurrence in FOIA cases. That, though, is not what defendants have done. As already discussed, very recently into this five-year long litigation, defendants have agreed to release everything that plaintiffs have really wanted in this case. Defendants did so by drips, first, with the information in spreadsheet 1, then with the information in spreadsheets 2 and 3, and finally with their agreement on the first day of the bench trial to release even the information that was not included in spreadsheet 3. Given that the trial had begun and the Court did not want to waste more years of everyone's lives in the event that an appellate court found that defendants' agreement to release information did not render this case moot, the trial continued. Perhaps because defendants were now in the odd position of having agreed that none of the information at issue in this case was exempt from release under FOIA, but still needing to present a defense as the trial continued, defendants chose to argue only that suppressed information was exempt. But, why the Court's interpretation of *Critical Mass* should be constrained by the position defendants chose for themselves is beyond the Court.

the Court should take into consideration not just all of the information defendants receive but also the form in which they receive it.

48

Second, the natural reading of the words "information provided to the Government" is exactly that—the information provided to the government. There are no qualifiers or limits put on the word "information," and none can be construed from the D.C. Circuit's preceding discussion. Thus, for this Court to add the qualifier "but only the information the government finally decides to defend as exempt," would fundamentally alter the *Critical Mass* test. Doing so would also effectively gut the relevance of information being "of a kind" if the government could limit the information at issue, for purposes of the *Critical Mass* test, to one slice of the information provided.

As a result, the Court concludes that the information to be considered, for purposes of whether information would customarily not be released to the public by the person from whom it was obtained, is all of the information provided to the government by the person.[26] In light of the Court's conclusion that defendants have failed to show Exemption 4 applies to all of the information Elsevier provided defendants, the Court thus finds that defendants have failed to show that Exemption 4 applies in this case.

---

[26] The Court has looked for case law in answering this question, and has found nothing directly on point. To the extent it is moderately on point, the Court notes that, in *Ctr. for Auto Safety*, the defendant initially refused to disclose information under Exemption 4, then provided some information, and then released further information. *Ctr. for Auto Safety*, 244 F.3d at 146. By the time the case reached the D.C. Circuit, 33 items of information remained in dispute, *id.*; obviously far more than 17 zip codes or suppressed information in general. It is concededly not possible to conclusively determine whether the categories of information still in dispute in *Ctr. for Auto Safety* were implicated in the pieces of evidence that the D.C. Circuit was asked to consider as evidence of customary release. The D.C. Circuit's discussion, though, is, at least, interesting. Notably, in considering evidence of a single Toyota model in a particular year, the D.C. Circuit compared it to the information Toyota provided to the defendant; not just the information that was still in dispute. *Id.* at 152. The D.C. Circuit also characterized evidence that it suggested constituted customary release as multi-model, multi-year information, which appears to have been the same way it characterized the information Toyota provided to the defendant. *See id.* That being said, given the nature of the information still in dispute in *Ctr. for Auto Safety*, it could be argued that, that information could also be characterized as multi-model, multi-year information, and thus, what the D.C. Circuit was referring to in that regard could be subject to debate. Nonetheless, this Court believes it more likely that the D.C. Circuit compared all of the information provided to the defendant in *Ctr. for Auto Safety*, rather than just the information still in dispute, for purposes of considering customary release.

## III.    In the Public Domain?

If the Court had reached a different conclusion with respect to the applicability of Exemption 4, plaintiff would still have been able to attempt to show that the information they requested should be released on the ground that the information was in the public domain.  *See Brown*, 835 F.3d at 1233; *see also Niagara Mohawk Power Corp. v. U.S. Dep't of Energy*, 169 F.3d 16, 19 (D.C. Cir. 1999) ("But the logic of FOIA compels the result: if identical information is truly public, then enforcement of an exemption cannot fulfill its purposes.").  In light of the Court concluding that Exemption 4 does not apply, though, it is not necessary to consider whether the information plaintiffs requested is truly public.  Nonetheless, so the record is as complete as possible, the Court will address the issue.

The party favoring disclosure of information, here, plaintiffs, has the burden of production in demonstrating that the information sought is identical to information in the public domain.  *Niagara Mohawk*, 169 F.3d at 19.  At closing argument, plaintiffs pointed to the ABMS website.[27]  As plaintiffs noted, the Court took judicial notice of what the ABMS website contains.  It contains: "the name, city, state, and specialty of all board-certified physicians and can be searched by persons who register and agree to certain terms and conditions by any combinations of board-certified name, city, town, state, or specialty.  The search results include a name, city, state, and country; they do not include an address or phone number.  Results do not include board-certified physicians who have requested that their information be kept private or who do not have active board certifications."

---

[27] So matters are kept as clear as possible, in considering whether information is in the public domain, it is irrelevant who put the information into the public domain.  As such, on this issue, the Court can consider whether ABMS (or anyone else) has released information to the public.  The public-domain issue is, thus, different from the customary-release issue, which only looks to whether the party from whom the government obtained information would customarily release it to the public.

In other words, even if the Court was willing to accept that information on the ABMS website was in the public domain, plaintiffs have only shown that the ABMS website contains "the name, city, state, and specialty of all board-certified physicians." Judicial notice was not taken of addresses (which, on this occasion, meant street addresses) or phone numbers. Moreover the judicial notice is silent as to zip codes. Although plaintiffs' motion for judicial notice asserted that searches could be done by zip code, the Court does not believe that this renders the search results identical to the information defendants receive with respect to zip codes. Notably, plaintiffs presented no evidence (such as a witness from ABMS) to support their assertion that a search for doctors in zip code 80230 would produce a list of doctors located only in zip code 80230. From the exhibit plaintiffs attached to their motion, the most the Court can assume is that, that is one possible outcome of the search. At most, therefore, the ABMS website only gets plaintiffs as far as names, cities, states, and specialities. Phone numbers, street addresses, and the key category of zip codes are still off the table.

At closing argument, plaintiffs also argued that the information they sought is sold to the public. By this, it appears that plaintiffs were referring to the printed books Elsevier sold up until December 2011 and the subscriptions Elsevier sells. In light of the discussion earlier about the public nature of releases to public libraries, the Court will accept that printed books and subscriptions to ABMS "directory dot com" that were sold to public libraries are in the public domain. As for the printed books, certainly with respect to the doctors and information contained on spreadsheet 2, plaintiffs job has been done for them in light of Amore's testimony that Elsevier agreed to release spreadsheet 2 because the information therein was included in the final edition of Elsevier's printed book. The information in spreadsheet 2 is, therefore, in the public domain. Given

that defendants have agreed to release spreadsheet 2, that conclusion is probably not mind-blowing for the parties. The more important question is whether the information in Elsevier's printed books and/or ABMS "directory dot com" placed into the public domain the remaining information plaintiffs sought.

As discussed earlier, the record is far from clear what information is provided on ABMS "directory dot com." The record is far clearer (thanks to spreadsheet 2) as to what information was contained in Elsevier's printed books. That information was the names, street addresses, cities, states, zip codes, and phone numbers of doctors. Such categories of information are the type of information plaintiffs sought as to the referee physicians used by defendants. As discussed earlier, the fact that information Elsevier provides to defendants is "of a kind" with information Elsevier released in its printed books is relevant to customary release. It is not relevant, however, to whether the exact same information provided to defendants is in the public domain. *See Ctr. for Auto Safety*, 244 F.3d at 151-152.

More specifically, plaintiffs have failed to go the necessary final step in order to show that the information they sought is identical to information in the public domain. That step would be presenting evidence of the contact information that was in the public domain for every single doctor subject to plaintiffs' requests. If that might sound like a lot of hard work, it probably is. But, the public-domain concept has little room for equities. *See Davis v. U.S. Dep't of Justice*, 968 F.2d 1276, 1280 (D.C. Cir. 1992) (explaining that, although the government's decision to only provide that which the plaintiff could find in the public domain was "grudging," it was supported by the Circuit's case law, and rejecting the plaintiff's arguments that such a result was inequitable and the government was in a better position to determine what was in the public domain). Like in *Davis*,

here, the fact that certain types of contact information for doctors are in the public domain is insufficient to show that the contact information for the specific doctors subject to plaintiffs' requests is there too.  Here, plaintiffs requested contact information for doctors used as referee physicians by defendants.  Plaintiffs, though, have not even presented evidence of the names of the specific doctors subject to their requests.  It is thus unclear how the Court is meant to conclude that the contact information in the public domain for those unidentified doctors is identical to the information plaintiffs sought.

Instead, it appears that plaintiffs want the Court to presume that, because there are publicly available sources containing contact information of doctors, the contact information plaintiffs sought from defendants must also be out there.  Putting aside the uncontradicted testimony from Amore that doctors could opt-out of the directories made available to public libraries but still appear in the information licensed to defendants, there is no reason why plaintiffs' assumption must be true.  Notably, while Amore testified that the doctors in spreadsheet 2 could be found in the 2011 or 2012 editions of the printed book, she also testified that none of the doctors on spreadsheet 3 were published in those books.  That could still leave open the possibility of the doctors on spreadsheet 3 being found on the ABMS website or ABMS "directory dot com," but, even if they could be found there, that does not mean that the doctors' contact information would not have changed between when plaintiffs sought the information and now.[28]  This is why, other than the doctors listed on

---

[28] Take, for example, the DORA website of which plaintiffs wanted this Court to take judicial notice.  In essence, since 2005, the DORA website has contained a list of the names and addresses provided by physicians.  Putting aside why that information has been provided by the doctors, assume that the reports plaintiffs requested from 2005 included the contact information of a physician.  Other than pure speculation, there is no evidence that the contact information on DORA's website in 2005 for that physician was the same as that included in the reports plaintiffs requested.  There is also nothing more than speculation that the contact information for the physician in 2005 is the same as it is now.  In order for plaintiffs' stated goal of showing the improprieties in defendants' selection of referee physicians to have

spreadsheet 2 (which, in light of Amore's testimony, the Court concludes is sufficient evidence to meet plaintiffs' burden as to those doctors only), plaintiffs needed to present evidence of the publicly available contact information for each doctor subject to their requests. Because plaintiffs have not done that, and because it is their burden to do so, the Court would have concluded that they failed to meet their burden of establishing that the information they sought was in the public domain, except as to the doctors on spreadsheet 2.[29]

## IV.    Final Observations

In reaching the conclusion that Exemption 4 does not apply to this case, the Court did not do so lightly. The principles underlying the *Critical Mass* test—namely, encouraging cooperation with the government by those not obliged to provide information and not impairing the ability of the government to make well-informed decisions—appear apt for both the information at issue in this case and the reasons why that information is needed—namely, to help run the DOL's workers compensation program. If Amore's testimony is to be believed as to this matter, Elsevier may decide to stop providing this information to defendants if a ruling goes against defendants, which implicates *Critical Mass'* concern with ensuring the continued availability of information to the government.

The Court has weighed all those matters in considering its decision. Ultimately, though, defendants and Elsevier only have themselves to blame for the result reached. First, this entire

---

any worth, plaintiffs need to know the zip codes of physicians when those physicians were actually used (or not used) by defendants. So far, plaintiffs have sought records from 2000 to 2011. There is absolutely no evidence in the record of any contact information of any physician during that time period that is in the public domain. That is presumably why plaintiffs are requesting the information from defendants.

[29] As a result, it is not necessary for the Court to address defendants' argument at closing that the public-domain doctrine is only applicable in this Circuit if, due to the public availability of requested information, the purpose(s) of an exemption would no longer be served. *See Prison Legal News v. Exec. Office for U.S. Attorneys*, 628 F.3d 1243, 1253 (10th Cir. 2011).

decision would have been rendered unnecessary if defendants had acted with just a modicum of due haste in reaching its decision to release all of the information plaintiffs requested. Even excluding the three and a half years prior to the Tenth Circuit's mandate being entered, there have still been more than 18 months since then. It was not until the imminent arrival of trial, though, that defendants started to release slices of information, and it was not until the first day of trial that the final slice of information was released. If the Court was of a more cynical bent, it would not be difficult to believe that, if trial had been scheduled a further six months out, defendants would still not have released any information.

Second, the Court cannot but mention the spreadsheets again. Spreadsheet 1 does not contain information from Elsevier. At closing argument, defendants' counsel explained that the reason the information in that spreadsheet had been withheld was due to defendants' belief that Exemption 6 applied to it. Putting aside that defendants dropped Exemption 6 as a basis to withhold information at least as long ago as July 16, 2018, when they filed their proposed findings of fact and conclusions of law, counsel's representation is hogwash. Contrary to counsel's apparent suggestion at closing, in asserting Exemption 4, defendants' motion for summary judgment made no differentiation between doctors provided by Elsevier and doctors from some other source that were still protected by Exemption 6. Instead, the motion stated that "[t]he doctors' names, phone numbers, and addresses are commercial information," and, most damningly, that the doctors' information was obtained from Elsevier. Equally damning is Amore's testimony. She testified that defendants requested Elsevier do additional research into 95 doctors that had been identified in plaintiffs' requests. The obvious questions is, why would defendants ask Elsevier to do research on the 40 doctors listed on spreadsheet 1 if defendants already knew that those 40 doctors had not come

from Elsevier. The answer is simple, defendants did not know that the doctors had not come from Elsevier because they had never, prior to Amore's recent additional research, checked. As such, counsel's attempt to now rely solely upon Exemption 6 for those 40 doctors is painting lipstick on a pig.

Third, the Court finds it difficult to accept the threat that the information licensed to defendants will not be available to them in the future. During her testimony, Amore testified that the license would be terminated if defendants released suppressed information. Putting aside that Elsevier has agreed to release the suppressed information at issue in this case, as the Court has alluded earlier, there is something simply not right about defendants even having suppressed information. If suppressed information is truly as sacred as Amore suggests, and Elsevier truly honors requests to suppress information, *then Elsevier should honor those requests and not provide the information to defendants*. Simply put, there is an easy way for Elsevier to avoid having information it is meant to have suppressed from being released by way of a FOIA request sent to defendants: stop giving defendants the suppressed information.

Amore also testified that Elsevier would terminate the license if defendants released its information without permission and/or if defendants were ordered to release its information in the future. As to the future, so it is clear, the Court makes no rulings (and certainly no orders) herein as to what may or may not transpire if defendants receive a FOIA request similar to the ones at issue in this case. As far as the Court is concerned, the conclusions reached herein are based upon the specific facts of this case, and relate solely to the FOIA requests that plaintiffs made. There can be no telling what facts may be presented in any future case.

The more relevant testimony is that, if defendants release Elsevier's information without its permission, Elsevier would terminate the license. This certainly seems to implicate the underlying government interest in voluntarily submitted information, which is ensuring its continued availability. That being said, the *Critical Mass* test takes that interest into account. As the D.C. Circuit explained, when information is voluntarily provided, there is a presumption that the government's interest will be threatened by disclosure because the betrayed provider of information will refuse further cooperation. *Critical Mass*, 975 F.2d at 878. When that is so, the private interest protected by Exemption 4 is "the protection of information that, for whatever reason, would customarily not be released to the public by the person from whom it was obtained." *Id*. (quotation omitted). The problem for defendants and Elsevier, here, is that, "for whatever reason," Elsevier has chosen to release to the general public information "of a kind" that it provides to defendants. It is, thus, hard to buy Amore's contention that, although Elsevier has allowed any patron of a public library to have access to a doctor's name or zip code, Elsevier will terminate a license (which provides Elsevier a yearly fee) if defendants release the same information without permission. Put simply, the governmental and private interests articulated in *Critical Mass* with respect to voluntary information are embodied in the test the D.C. Circuit came up with. Here, defendants have failed to satisfy that test, and thus, this Court concludes that disclosing the information plaintiffs requested would not "frustrate Congress's purpose of encouraging cooperation with the Government by persons having information useful to officials." *See id*. (quotation omitted).

## V. Conclusion

For the reasons set forth herein, the Court FINDS and ORDERS that, with respect to plaintiffs' sole cause of action, defendants violated FOIA in withholding the records that plaintiffs requested.

In their Complaint and in the final pretrial order, plaintiffs requested declaratory relief, injunctive relief, and attorneys fees. With respect to declaratory relief, the Court has provided plaintiffs with the relief they sought in finding and ordering above that defendants violated FOIA in withholding the records that plaintiffs requested. With respect to injunctive relief, plaintiffs ask for two things. First, an order directing defendants to turn over the records plaintiffs requested. That request is GRANTED as follows: defendants shall provide plaintiffs with all of the records plaintiffs requested **completely unredacted** within **thirty (30) days** of entry of this Order. Second, an order enjoining defendants from relying on an unlawful practice in all future FOIA undertakings. For the reasons set forth above—namely, plaintiffs failure to allege or prove an invalid "policy or practice" claim—, that request is DENIED. With respect to attorneys fees, pursuant to Fed.R.Civ.P. 54(d)(2), plaintiffs may file a motion for attorneys fees no later than 14 days after the entry of Judgment. In other words, the Court reserves ruling on whether plaintiffs are entitled to attorneys fees, and, if so, to what extent, until the matter is fully briefed.

The Clerk is instructed to enter Judgment in favor of plaintiffs as set forth herein.

The Clerk is further instructed to ADMINISTRATIVELY CLOSE this case once Judgment is entered.

**SO ORDERED.**

DATED this 31st day of August, 2018.

BY THE COURT:

_____

RAYMOND P. MOORE
United States District Judge